IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 8, 2008

**In Re D.C.A.**

**Appeal from the Chancery Court for Hickman County**
**No. 03-235A    Robbie T. Beal, Judge**

---

**No. M2008-01279-COA-R3-PT  - Filed March 30, 2009**

---

The trial court terminated the parental rights of the father of an eleven year old boy on the ground of abandonment by willful failure to pay child support. The father admitted that he did not pay the child support ordered by the court, but claimed that his failure was not willful. He argued that his record as a convicted felon prevented him from finding and holding steady employment, thus rendering him unable to pay any support at all. However, the record shows that Father was able-bodied and did in fact work at a number of jobs after his felony conviction. We accordingly affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right**; **Judgment of the Chancery Court
Affirmed**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Melanie Totty Cagle, Centerville, Tennessee, for the appellant, Brian William Ball.

Dana Dye, Centerville, Tennessee, for the appellees, Mark Coggins and wife, Catherine Coggins.

**OPINION**

**I. BACKGROUND**

The child at the center of this controversy, D.C.A.,was born in Memphis on February 15, 1997 to C.C. ("Mother") and B.W.B. ("Father").[1]  Mother also had a daughter from an earlier relationship. Father and Mother had dated for a year and had lived together in the home of Father's sister before Mother became pregnant. However, they never married, and Father was incarcerated

---

[1]The child's given name at birth produced the initials D.C.A.  After his adoption on December 23, 2003, he took his adoptive father's last name, and became D.C.C.  The adoption was later vacated.

for a parole violation at the time of D.C.A.'s birth. Father was released when D.C.A. was sixteen months old. Shortly thereafter, he and Mother started dating again.

Father had moved into a townhouse with his own mother, and Mother agreed to join him because Father was working with the ironworkers union, was doing well, and Mother thought "we might be able to make it work." The arrangement only lasted a month or two. The testimony of the parties as to the reasons for the failure of their relationship differed markedly.

In any case, Mother married another man and moved with him to Olive Branch, Mississippi. The parties differed in their testimony as to the frequency of Father's visitation with D.C.A. while she was living in Mississippi as well as during other times. Mother testified that Father's visitation was regular for about three months, but that it then became sporadic and ended entirely. Father testified that his visitation continued until hostility by Mother's husband caused it to end.

In January of 1999, Father petitioned the Shelby County Juvenile Court to be legitimized as the father of D.C.A. The order of legitimation included a child support obligation of $210 per month and a finding of child support arrearage in the amount of $2,520. The proof shows that Father made only three payments of child support after the order of legitimation was entered: a payment of $214 on February 10, 1999, a payment of $95 on April 7, 1999, and a payment of $2,801, collected through intercept of an income tax refund on March 9, 2001.

Mother's relationship with her new husband was apparently not stable, and he filed for divorce. Mother left Mississippi in March of 2000 and moved to Hickman County, Tennessee. Although Mother did not notify Father of the move, his sister discovered Mother's new address and informed Father. Father then filed a pro se petition for visitation in the Hickman County Juvenile Court.

The court entered an order of visitation *pendente lite* on November 27, 2000, with visitation every other weekend to be supervised by Father's sister and a study to be conducted of Father's home. After the home study was completed, the court conducted a hearing in June of 2001 and entered a permanent order of visitation without the requirement of supervision.

At some point, Mother had become involved with petitioner M.C., a man she had known since they both were children. Mother and M.C. married, and M.C. assumed the role of father to D.C.A. M.C. testified that he and D.C.A. do everything together, including working in the garden, working on vehicles, and participating in church activities. M.C. stated that D.C.A. calls him Daddy, and "he is my buddy. He is my son." M.C. also testified that he was supportive of Father's efforts at visitation because he himself had been involved in a very painful custody battle over his oldest son, so he knew how it felt. M.C. adopted Mother's older child, and he and Mother discussed the possibility that he might also adopt D.C.A.

Father's visitation order provided that the parties would exchange the child for purposes of visitation at an interstate exit midway between Hickman County and Memphis. Mother and M.C.

both testified that on many occasions she and D.C.A. waited at the exit for hours and Father never showed up.  Father testified that he sometimes missed visitation because of car trouble or because he had to work, but that he always called Mother to let her know.  On one occasion, Father was extremely late in returning D.C.A. to Mother.  After that incident, Father was told he would have to come all the way to the police station in Centerville for exchanges.

While Mother was forging a new marital relationship, Father was doing the same.  He married on August 18, 1999, and he and his new wife became the parents of three more children, who were born in 2000, 2001 and 2002.  According to Father's testimony, D.C.A. became close with those children during visitation, and the child greatly enjoyed his visits.  Father also testified that he and his wife separated at some point and that his wife supported him during their separation.

On December 3, 2002, Father, his wife, and his brother-in-law were arrested on drug charges, apparently on suspicion of operating a meth lab out of their home.  M.C. and Mother read about the arrests in the Memphis newspaper.  Mother then filed a petition to suspend visitation, which was granted.  Father remained in jail until February 2003, when the charges against him were dropped.  His wife pled guilty to a lesser charge and was sentenced to time served.  After they were released from jail, Father and his new wife separated, and he returned to live with his sister.

On May 20, 2003, Father was arrested on a federal charge of possession of ammunition by a convicted felon (he had previous convictions for aggravated burglary and for escape).  He pled guilty to the charge and was sentenced to six years in prison.  He was released to a halfway house on December 21, 2007 and was then allowed to return to his sister's house on home confinement.

## II. THE FIRST TERMINATION PROCEEDING

On September 24, 2003, M.C. and Mother ("Petitioners") filed a Petition in the Hickman County Chancery Court to terminate Father's parental rights and for M.C. to adopt D.C.A.  The petition alleged that Father had neither visited nor provided financial support for D.C.A. for a period of four months immediately preceding the filing of the petition.  M.C. and Mother testified that at the time they filed their petition, they did not known that Father was in federal prison.

Not surprisingly, an attempt to serve the petition on Father was unsuccessful.  The summons to Father's Memphis address was returned "not to be found in my county."  The Clerk and Master then achieved service by publication, publishing notice of the petition for four consecutive weeks in the Hickman County Times.  The court conducted a hearing on the petition, entered a default judgment against Father on December 23, 2003, and granted M.C. a decree of adoption.

Father filed a *pro se* motion from prison to set aside the default judgment and the decree of adoption.  The motion was denied by the chancery court.  Father then filed a timely notice of appeal to this court, which remanded the case so counsel could be appointed for father.  After counsel was appointed, an amended petition was filed to vacate the decree of adoption based upon the failure to

properly serve Father pursuant to Tenn. Code Ann. § 37-1-117(m)(3).  On June 11, 2007, the Chancery Court granted Father's petition and appointed a guardian ad litem for D.C.A.

### III. THE CURRENT PROCEEDING

After negotiations with federal authorities to allow Father's attendance, the parties agreed on April 25, 2008 as the date for a hearing on the termination petition.  Father, Mother and M.C. testified at the hearing, and the history set out in the first section of this opinion is largely derived from their trial testimony.  One potential witness who was not called was D.C.A.  He was eleven years old at the time.

D.C.A. had never been told that his adoption had been set aside, and the parties and the guardian ad litem agreed not to involve him in the proceedings out of concern for his emotional well-being.  According to the testimony of M.C., D.C.A. sometimes tells him, "Daddy, I have your fingers.  Daddy, I have your ears.  Daddy, I have your hair."

Six individuals connected with M.C.'s church testified as to their own observations of D.C.A. and his relationship to M.C.  They all praised D.C.A. as a polite, thoughtful, well-mannered and responsible child, and declared that M.C.'s relationship with D.C.A. appeared to be a normal loving relationship between father and son. For example, a youth leader testified that when D.C.A. had problems, "[M.C.] always stopped and spent time with him and talked to him and explained things to him. You know, every time you saw [M.C.], most of the time [D.C.A.] was with him. It was a strong relationship."  Several witnesses testified that they did not realize that M.C. was not actually D.C.A.'s biological father until this case made them aware of that fact.

Father's sister, R.B., also testified.  She stated that after Mother moved to Hickman County and D.C.A.'s visitation with Father resumed, it always took place at her house.  She testified that although he missed some of his every other weekend visits, there was no period of time where he went four months without visiting his son.  She also testified that the child called her "Aunt R.," and called her mother "MeeMaw," that Father always acted appropriately with D.C.A., and that the child enjoyed the visits and was very happy.  However, M.C. testified that after his second visit at R.B.'s house, D.C.A. started wetting the bed and crying at night.

For the purposes of this appeal, some of the most relevant testimony had to do with Father's employment history just prior to December 3, 2002, when he went to jail.  It is undisputed that Father paid absolutely no child support during that period and that the two payments he made in 1999 and the payment made by tax intercept in 2001 were the only child support payments he ever made. R.B. testified that Father was unemployed for significant periods of time and that he often lived "off the kindness of others."

Father testified that he worked in the ironworkers union in 1998 and was making good money, but that he quit that job after Mother left him, and it was "the dumbest thing I ever done." Father filed a joint tax return with his wife in 2000, for which he got the refund that was intercepted

for child support purposes. He testified that he did not have a copy of the 2000 return, and that he did not file a return for any subsequent year. However, he did work at a number of odd jobs and other jobs of relatively short duration.

In almost all of the jobs, Father testified that he was paid "under the table" so he could not produce records of them. For example, he worked for a few months helping to repossess cars. The checks for that job were made out to someone else. He worked for a carpet cleaning company but "got paid by the job so it was nothing." He did some remodeling work, and he worked for a heating and air conditioning company off and on, for all of which he was paid in cash. He also worked as a bouncer at several strip clubs in the year 2000 and as a D.J. at another strip club for four months in 2001.

Father further testified that he did not work after the strip club employment ended, but was supported by his wife, who worked at Blue Bell Ice Cream and Waffle House. After he and his wife separated, she continued to support him. Asked why he did not work during that period, he explained that he gave his wife the truck so he did not have transportation, and that besides, "It is not easy to find work. It ain't like I didn't try. I'm a convicted felon first thing." However, asked for the names of any places where he tried to look for work during that period, he couldn't remember any, and he acknowledged that he did not go to the Tennessee Employment Security Office to take advantage of the services it offered.

At the conclusion of proof, the court announced that Petitioners had not met their burden of proving by clear and convincing evidence that Father had abandoned D.C.A. by failing to visit him in the four months prior to December 3, 2002, when he went to jail. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). The parties then presented closing arguments on Petitioners' remaining claim: that Father had abandoned D.C.A. by willfully failing to support him during that same statutorily significant four month period.

Petitioners pointed out that Father was in good health and able-bodied and that his own testimony showed that he managed to find a succession of income-producing jobs after the birth of D.C.A. They also noted that it is undisputed that Father only made three payments of child support, two of which were voluntary, and one of which came about because of an income tax refund intercept. It is undisputed as well that Father did not pay any child support in the four months prior to his incarceration. Because he did not file any income tax returns after the intercept, and because he was paid "under the table" for all his jobs, Petitioners contended that they had no way to prove how much he earned, but they argued that his failure to contribute even a single dime to his son's support should be considered willful under Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Father's attorney conceded that Father had made some bad choices, but argued that none of them justified the loss of his parental rights. He noted that Father's work was sporadic, that he was supported at different times by his sister and by his wife, and that there was no proof that he spent what money he did earn in an extravagant way. He argued that Petitioners failed to present any proof that Father did any income-producing work during the critical statutory four month period, and he

concluded that Father's failure to pay child support during that period should not be considered willful. The attorney also argued that it was not in D.C.A.'s interest for Father's parental rights to be terminated.

After a recess, the court announced its decision from the bench. The court stated that it found grounds for termination existed in that Father "has willfully failed to pay child support over an extended period of time, not just simply the four months preceding the petition." The court found that Father had the ability to work, even though the job market might have been limited by Father's felony conviction, which the court acknowledged was "not a resume builder."

The trial court said, "[t]here is just no basis for the Court to believe that he was unable to find work, unable to engage in work and unable to support the child in any meaningful way." The court was also disturbed by Father's failure to file income tax returns after the tax intercept of 2000, because,"it was almost as if [Father] said, 'what is the point of filing these things. You know the mother is going to get it anyway.' So I just don't believe the father made a legitimate attempt to provide for this child."

The court then discussed the best interest of D.C.A. in light of each of the relevant statutory factors set out in Tenn. Code Ann. § 36-1-113(i), and found that several weighed in favor of termination, including the lack of a meaningful relationship between Father and D.C.A., Tenn. Code Ann. § 36-1-113(i)(4), and Father's failure to pay court-ordered child support, Tenn. Code Ann. § 36-1-113(i)(9).

The court also noted the stability of D.C.A.'s existing family environment and that he "does well at school, is well-mannered and responsible." The court concluded that "after all these years it seems to be unnecessary to disrupt this status of the child." The court accordingly held that a very significant factor in favor of termination was "the effect a change of caretakers would have on the child's emotional, psychological and medical conditions." Tenn. Code Ann. § 36-1-113(i)(5). The court accordingly found clear and convincing evidence that it was in D.C.A.'s best interest that the parental rights of Father be terminated. Its decision was memorialized in a Final Judgment which was filed on May 8, 2008. This appeal followed.

## IV. ANALYSIS

### A. STANDARD OF REVIEW

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest in doing so. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of

> severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian. The parent or guardian shall have no further right to notice of proceedings for the adoption of that child by other persons and shall have no right to object to the child's adoption or thereafter to have any relationship, legal or otherwise, with the child. . . .

Tenn. Code Ann. § 36-1-113(*l*)(1).

The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996), quoting *Santosky,* 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.*, (quoting *Santosky*, 455 U.S., at 774, 102 S. Ct. at 1405 (Rehnquist, J., dissenting)).

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition, it must also be shown by clear and convincing evidence that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

## B. GROUNDS FOR TERMINATION

In this case, the trial court only found a single ground for termination, abandonment by failure to support. Our legislature has furnished us with a very specific statutory definition of abandonment which we are obligated to follow in termination cases. Tennessee Code Annotated § 36-1-102(1)(A)(i) states that abandonment occurs when a parent who is the subject of a petition for termination of parental rights has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child who is the subject of the petition for a period of four consecutive months immediately preceding the filing of the termination petition.

In cases like the present one, where the parent was incarcerated when the termination petition was filed, or where he has been incarcerated during all or part of the four months prior to the filing of the petition, another section of the statute puts a variation of the above definition into play. Abandonment then occurs if the incarcerated parent or guardian

> ...either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

In the present case, Father was incarcerated at the time of the filing of the termination petition as the result of his arrest on federal charges, which occurred on May 20, 2003. We note that the trial court and the parties agreed that the relevant period to look at for purposes of determining abandonment was the four months prior to Father's arrest on December 3, 2002, presumably because less than four months elapsed between his February 2003 release and his arrest on federal charges.

There is no suggestion in the record that Father's conduct between those two arrests differed in any substantial way from his conduct prior to the first arrest. We, therefore, do not believe that there would have been any difference in the outcome regardless of which four-month period the court used.

Since it is undisputed that Father failed to make any payments toward the support of D.C.A. after 2001, the dispositive question is whether that failure was willful. As our Supreme Court stated in *In re Swanson*, 2 S.W.3d 180, 186 (Tenn. 1999) the statutory language "willfully failed to visit" and "willfully failed to support" establishes a constitutionally necessary element of intent which must be found to exist for any valid determination of abandonment. Thus, a party who was unable to make payments to support his child has not abandoned the child under the statutory definition. See *in re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)(indigent mother's failure to pay support not deemed willful because there was no proof that she was able to financially support her children in any way). *See also O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995)

Father argues that his failure should not be deemed willful because he did not work during the relevant period and thus had no income. He claimed that he could not find work owing to the difficulties he faced as a convicted felon. However, Father's status as a convicted felon dated from his 1996 conviction for aggravated burglary. The trial court took note of the fact that Father was able-bodied and that he had managed to find a number of different jobs, however sporadic or short term, after the 1997 birth of D.C.A. Despite the income he earned from those jobs, Father did not pay any child support for D.C.A. after the income tax refund intercept for the year 2000. The court noted that Father's income level may have prevented him from paying the full amount of court-

ordered support, but it did not prevent him from making at least some contribution towards the support of his child.

As the trial court observed, Father's failure to pay child support prior to the statutory four month period does not establish a ground for termination, but it is probative of Father's intentions in regard to his parental obligations. The proof shows that while Father may have been interested in maintaining his relationship with D.C.A. through visitation, he demonstrated through his conduct that he did not have any intention to pay support for D.C.A.'s benefit after the income tax intercept of 2001. We therefore agree with the trial court that the ground of abandonment has been proved by clear and convincing evidence.

## C. BEST INTEREST

Once a ground for termination is proven by clear and convincing evidence, the next inquiry for the trial court is whether termination of a parent's rights is in the best interest of the child, which also must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(2). Another section of that statute sets out a list of non-exclusive factors for the court to consider in making its determination of best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;  or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(I)

Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right to be terminated. The relevance and weight to be given each factor depends on the unique facts of each case. In some cases one factor alone may be sufficient to determine the outcome. *In Re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005).

The trial court discussed each of the statutory factors in turn, and found that some of them did not apply to the situation before it. At the same time, the trial court found that Father did not maintain regular visitation or contact with D.C.A. (factor 3). The court also found that Father failed to establish a meaningful relationship with the child (factor 4) and that Father failed to pay court-ordered child support (factor 9). Father argues in essence that all of these failures were due to circumstances beyond his control. He argues that he visited D.C.A. as much as he could, but that the burden of traveling to Hickman County made such visitation difficult and his prison sentence made it impossible. He claimed that he did enjoy a meaningful relationship with D.C.A. before he went to federal prison, and that he wished to establish such a relationship again. He also claimed that his status as a convicted felon prevented him from obtaining gainful employment and paying child support.

The trial court cited factor (5) as the most important for its decision, "The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." The court noted that an actual change of caretakers was not at issue in the current proceedings, but rather the emotional and psychological implications for the child that would arise from a disruption of the stable life that he enjoyed with Mother and M.C.

The proof showed that M.C. has taken care of and supported D.C.A. for eight of his eleven years. M.C. is in regular contact with his teachers, and is involved in all of D.C.A.'s school and church activities. D.C.A. is a good student, and is regarded by the adults in his church as a polite, thoughtful and responsible child. D.C.A. considers M.C. to be his father. At some level the child may understand that M.C. is his adoptive father rather than his biological father, but his comments show that he does not fully understand the concept. He is unaware that the trial court vacated his adoption. In its ruling from the bench, the trial court stated that D.C.A. is "blissfully ignorant, and quite frankly that is what we want our children to be."

M.C. was initially supportive of Father's visitation with D.C.A., and Father was able to enjoy such visitation in his sister's home in Memphis. She testified that D.C.A. enjoyed the visitation, but M.C. testified that after the second such visit, D.C.A. started wetting the bed and crying at night. Mother invited Father to attend D.C.A.'s ball games at his school, but Father never came to anything related to school or related to D.C.A.'s sports activities. After December 3, 2002 when Father was arrested on a drug charge, his visitation with D.C.A. ended. His last direct contact with the child was by a telephone call around Christmas of 2002. Father has not played any role in D.C.A's life since the child was five years old, largely as the result of conduct which seems to bring him into conflict

-10-

with the law on a regular basis. It does not appear that the reintroduction of Father into D.C.A.'s life would be of benefit to the child, but rather that it would unsettle his confidence in the stability of the family unit that has allowed him to flourish thus far.

It is well-established that the best interests of the child are to be determined from the perspective of the child rather than that the parent. *See In Re Marr,* 194 S.W.3d 490, (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Thus, while the obstacles in Father's path are entitled to some consideration when we are determining grounds for termination, they are entitled to much less consideration when we are deciding the question of the child's best interest. Further, this court has rejected the proposition that a parent obtains some sort of immunity from application of the factors that are used to determine a child's best interest by disabling himself from participating in the day-to-day life of the child, when he engages in criminal activities that result in incarceration. *In Re Audrey S.*, 182 S.W.3d at 880.

We acknowledge that Father, unlike many of the respondents in parental termination cases, made considerable (albeit sporadic) efforts to remain a factor in his child's life. He filed a petition to legitimate D.C.A. and he asked the court for help in enforcing his visitation rights. He exercised visitation on and off through several changes in residence by Mother. He testified that he sent a card to D.C.A. while he was in federal prison, but that he got it back stamped *Return to Sender*. He also testified at trial that he loved D.C.A. and wanted to remain part of his life. Petitioners do not challenge Father's testimony as to his affection for D.C.A., but as we indicated above, the needs of the child must take priority over the desires of the parent when the child's best interest is at issue.

Viewed from the perspective of D.C.A., the record clearly and convincingly establishes that it is in the child's best interests that Father's parental rights be terminated.

## V.

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Hickman County for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, P.J., M.S.